CLARK, Retired Circuit Judge.
On an indictment charging murder in the first degree, appellant was convicted of manslaughter in the first degree and sentenced to imprisonment for ten years in accordance with the verdict of the jury.
Defendant and the alleged victim, Julie Vore, were not married, but their physical relationship had been as if they were for more than a year prior to her death. She was sixteen years of age; he was twenty-nine. They were the parents of a daughter born three weeks before who was with them at the time the mother was shot in an automobile while the three were returning through Sumter County, Alabama, to New Orleans where they lived, from a trip to Birmingham commenced the night before. Accompanying them all the way were an acquaintance, Tommy James, and his girl friend, Patricia Dellsperger. James was driving the automobile at the time and defendant, the purported owner, was also on the front seat. The victim, Patricia and the baby were on the rear seat. Patricia was sitting behind the driver; the victim was sitting behind appellant.
The only living witnesses to the killing testified on the trial. Tommy James testified on call of the State; Patricia Dellsper-ger testified on call of the defendant and was followed as a witness by defendant himself. The three were in general agreement that there were pleasant, as well as unpleasant, relations between defendant and Julie Vore on the trip to and from Birmingham and while they were in Birmingham on the intervening day, a Sunday, visiting friends and relatives of both defendant and James and exhibiting the baby to them. James testified to more fussing, which at times approached threats of physical violence, than did Patricia. All three testified that they indulged in controlled substances in going and returning. While in Birmingham defendant traded a pistol and received in exchange a pistol that, according to the undisputed evidence, he procured for Julie’s approaching birthday. As they left Birmingham, the pistol was a topic of conversation. Before reaching Sumter County, it was fired once out of the window of the traveling automobile by James and another time by defendant, each while the other was driving.
Appellant’s version as to what occurred was that as he was handling the pistol the baby in the back seat began to cry; that he requested its mother to hand the baby to him, which she did while cursing him. He then asked for the baby’s blanket so he could keep the baby warm, but not getting the blanket, he, while holding the pistol in his right hand, reached back to the rear seat with his right hand to pick up the baby’s blanket. He said:
“And, I told her about the blanket and I went to raise up and I reached over the seat with intentions of grabbing the blanket and she grabbed me and the gun went off. It was like — it don’t seem like two seconds.”
Patricia’s version was very similar to that of defendant. .She said she saw the victim put both of her hands upon defendant’s hand and that they were struggling at the time the pistol was fired.
The testimony of the witness James was to the effect that as he was driving the automobile, he was not paying close attention visually to the action as between defendant and Julie. However, he said that shortly before the shot the two were arguing as they had been and that defendant told “her if she didn’t be quiet, he was going to kill her.” This was denied by *661 defendant; the testimony of Patricia corroborated his denial. The witnesses were in general agreement that immediately after the shot was fired great concern and sorrow were manifested by defendant. Julie was taken to the hospital at York and from there to a hospital in Meridian where she died.
Undisputed testimony shows that the victim died from the bullet of the weapon in the hand of defendant at the time it was fired; the bullet entering the victim’s head between the eyes. Expert testimony was to the effect that the muzzle of the pistol was within six or eight inches of the victim’s head at the time. Furthermore, an expert witness testified that after considerable testing of the particular pistol he found that it could hardly have been caused to fire by any usual force other than by pulling or squeezing the trigger; that the pistol would not fire while on safety or in a half-cocked position.
There may be an omission herefrom of some details that perhaps one or the other of the parties thinks should be included, but, as there is no express issue between the parties as to the sufficiency of the evidence to support the verdict, we deem the foregoing summary adequate for a consideration of the questions presented on appeal.
A major contention of appellant is as to “questions to Appellant’s witness, Patricia Dellsperger, and later, in questions to Appellant; the State, over the objection of Appellant’s attorneys, asked questions and elicited testimony to the effect that during the time that Julie Vore, the decedent, lived with appellant, she worked as a prostitute.” The reference to questions asked the witness, Patricia Dellsperger, shows the following:
“Q. You stayed home a lot. Do you know whether or not she was working the streets as a prostitute while she lived with Eddie? If you know.
“MR. UPCHURCH: I object to that, if Your Honor please. It’s nothing in the world but to prejudice the jury’s mind; it has nothing whatever to do with the homicide.
“THE COURT: Overruled.
“MR. UPCHURCH: And, we except.
“MR. WATKINS: (Continuing)
“Q. Do you know?
“A. Do I know that she was working on the streets?
“Q. Right. While she was living with Eddie.
“A. No, I don’t know.”
The reference to the questions asked defendant on cross-examination discloses the following:
“Q. Oh, I see. Now, isn’t it a fact, also, that while Julie lived with you she was working the streets and you were collecting the money for it?
“MR. UPCHURCH: I object to that, Your Honor. It’s got nothing to do with this case.
“MR. WATKINS: (Continuing)
“Q. Well, he talked about how much he loved her. I think if she was a prostitute working for him it would be admissible.
“THE COURT: Overruled.
“A. She was not a prostitute working— she was a prostitute before she knew me. I made her stop.
“Q. Oh, she has stopped from the time you first knew her and never worked it any more?
“A. No, sir.
“Q. Is that what you are testifying?
“A. No, sir.
“Q. What is your testimony?
“A. She committed acts of prostitution afterwards.
“Q. After she was living with you?
“A. Yes, sir.”
Both inquiries quoted above were made after defendant had defined the genuinely contested issue by contending that the death was accidental. Although neither party cites any exact precedent on the specific subject of the inquiry, and we have found none, we are not persuaded that it does not come within one of the “well-rec *662 ognized exceptions”[1] to the exclusionary rule as to other crimes or wrongful conduct, particularly evidence of motive for the commission of the crime, or that it is included within the exclusionary rule. According to Judge McElroy:
“The foregoing exclusionary rule does not work to exclude evidence of all prior crimes, only such as are offered to show the defendant’s bad character. If the defendant’s commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than as tending to prove guilt via bad character, then proof of such act is admissible.”
Gamble, McElrov’s Alabama
Evidence. § 69.01(1) (1977)
Furthermore, there is little basis for any conclusion that the testimony elicited by the quoted interrogation was harmful to defendant or any more unfavorable than it was favorable to him. Patricia said she had no knowledge as to the matter. Defendant flatly denied any crime or misconduct by him as to the matter and asserted activity on the part of the victim that would have been prejudicial to her but not to him.
It should also be stated that evidence as to prostitution had already been injected into the case on the direct examination of Tommy James at a time before the only live issue between the parties was as to whether the killing was accidental, and at that time the court sustained the only objection made by defendant to the inquiry. In asking the witness as to his acquaintance with defendant and the victim when the three were living at the same residence in New Orleans when the victim was fourteen years old, the following occurred:
“Q. Were they living together as a man and a woman live together?
“A. Yes, sir.
“Q. At that time were they working, either one of them?
“A. Yes, sir.
“Q. What kind of work were they doing?
“A. Prostitution.
“Q. Prostitution? What was Mr. Lowery doing? What was his part in the prostitution?
“MR. UPCHURCH: Your Honor, please, I object to that. It has nothing in the world to do with this case.
“THE COURT: Sustained.”
We find no error prejudicial to defendant in any of the court’s rulings on the subject of prostitution.
The only other assertions of prejudicial error are as to the alleged refusal of three separate requested written charges.
None of the three charges, nor any of the written charges allegedly requested by defendant, were signed “given,” or “refused,” as required by Code of Alabama 1975, § 12-16-13.[2] Each requested written charge has under the left margin thereof, typing as follows:
“GIVEN: _
“REFUSED: _”
It seems that there is a practice in some venues for like forms of written charges to be submitted to the trial judge and for the trial judge to indicate his action by a check mark after the word “GIVEN” or the word “REFUSED” without signing or writing thereon any part of his name. This was apparently the procedure in the instant case, and each of the three requested written charges asserted as error on appeal contains a check mark after the word “REFUSED.”
Appellee challenges the assertion of prejudicial error as to the charges on the ground that the failure of the trial judge to sign his name precluded a reversal for the alleged refusal thereof by the trial judge, as held again recently in Stoudemire v. State, Ala.Cr.App., 365 So.2d 376 (1978) and Maund v. State, Ala.Cr.App., 361 So.2d 1144 (1978). The record here indicates, though it *663 does not conclusively show, that the trial judge had put a check mark after the word “REFUSED” before the conclusion of its oral charge. At that time, defendant promptly stated:
“Defense counsel objects to the refusal of the Court to give his written Charges.”
Whether under all the circumstances the matter under consideration comes fully within the inhibition of appellate review established in Stoudemire, supra, and Maund, supra, in previous cases, we need not now decide, by reason of our determination hereafter made as to the charges, and we feel that we should not attempt at this time to decide the particular issue raised by appellee in the absence of any response to it by appellant by a reply brief or otherwise. However, with due respect to all concerned, we do express disapproval of any method that may apparently violate positive requirements of § 12-16-13 of the Code.
All of the written charges requested by defendant are unnumbered. Neither the cited current Code section nor its predecessors contain a requirement that charges be numbered. Bearden v. LeMaster, 284 Ala. 588, 226 So.2d 647 (1969). Nevertheless, we invite attention to the desirability of a numbering or lettering of the written charges in the interest of a proper determination of the merits of requested charges and a more concise and understandable discussion of them in an opinion.
The first of the three unnumbered charges is as follows:
“The Court charges the Jury that the Defendant, Eddie Lowery, enters into this trial with the presumption of innocence, and this is a fact in this case, which must be considered with all the evidence and should not be disregarded.”
Appellant argues that the refusal of the identical charge was held to be reversible error in Chaney v. State, 178 Ala. 44, 59 So. 604 (1912). He is correct. However, in the light of the rationale of a strong dissenting opinion in Chaney in criticism of the use of “not to be disregarded,” the Supreme Court overruled the effect of Chaney in McClain v. State, 182 Ala. 67, 62 So. 241, 243 (1913). See Gordon v. State, 40 Ala.App. 214, 110 So.2d 329, 332 (1958). We do not find that it has ever been approved since.
Another of the unnumbered charges under consideration is a replica of Charge E in Haithcock v. State, 21 Ala.App. 367, 108 So. 401 (1926), wherein it was held that the refusal of the charge constituted reversible error. However, it was stated therein that the result was required because the “principles involved in this charge were not substantially given by the Court in either his oral charge or written charges given at the request of defendant.” They were “substantially given” in the oral charge in the instant case. Portions of the court’s oral charge as to the presumption of innocence of defendant and the burden of proof upon the State, were lengthy and comprehensive. Included were the following:
“. . .A defendant in a criminal case comes into court and they are presumed to be innocent until proven guilty beyond a reasonable doubt and to a moral certainty. . . . The presumption of innocence is something to be taken factually in favor of the defendant until the state introduces evidence that convinces each one of you of the guilt of the defendant beyond a reasonable doubt and to a moral certainty. . . . The State has—the state has the burden of proving that the defendant is guilty as charged, and the state must satisfy each one of you, before you can return a conviction against the defendant, that the defendant is guilty beyond a reasonable doubt and to a moral certainty.If, after considering all the evidence in this case, your minds are left in such a condition that you cannot say that you have an abiding conviction of the truth of the charge that defendant is guilty beyond a reasonable doubt and to a moral certainty, then it would be your duty to return a verdict finding the defendant not guilty and acquitting him. . . . ”
The third of the unnumbered charges is patterned after Charge 28 in Davis v. State, 8 Ala.App. 147, 62 So. 1027, cert. denied 184 Ala. 26, 63 So. 1010 (1913), *664 wherein it was held that the charge was a good charge but that it was substantially covered by other written charges. With particular reference to the necessity for a conviction that the evidence of guilt must be “strong and cogent,” the court, in quoting written given charges that substantially covered the principles contained in Charge 28, did not include any charge wherein the words “strong and cogent” are found, from which it is clearly deducible, and we so hold, that words of equal meaning are of equal value to the party requesting the charge.
We find no error in the record prejudicial to the defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge, of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.

. Hinton v. State, 280 Ala. 48, 189 So.2d 849 (1966).

. “Code Commissioner’s Note. — This section is superseded by A.R.C.P., Rule 51, as to civil proceedings, but has been retained for possible applicability in criminal or probate proceedings.”