LEIGH M. CLARK, Retired Circuit Judge.
A jury found defendant guilty of an attempt to commit rape in the first degree. The court fixed his punishment at imprisonment for five years and sentenced him accordingly. Rape in the first degree is a Class A felony. Alabama Criminal Code, § 13A-6-61(b). An attempt to commit a Class A felony is a Class B felony. Alabama Criminal Code, § 13A-4-2(d)(2). Punishment for a Class B felony, as provided by § 13A-5-6(a)(2) is “not more than 20 years or less than 2 years.”
The only eyewitness who testified as to the incident was the alleged victim. The defendant did not testify in the case and rested upon the close of the evidence presented by the State.
The alleged victim, a married woman, testified that on the evening of March 11, 1981, as she was on her way walking to work, she was asked by defendant whether she wanted to ride in the automobile he was driving and that she replied affirmatively and “got in the ear.” Instead of taking her to work, he told her that he wanted to “buy some speed” from a particular individual, that he wanted to “catch him before he goes to work, and he lives right down here.” She replied, “Okay, I have got twenty minutes, I will ride with you.” According to her testimony, after he had proceeded on the main highway a distance, he turned from it, and she told him, “Well, look, I really need to get to work.” She asked him “to run [her] back to work” and said she, at the time, “knew something was wrong, because he acted like he didn’t know where he was going.” Thereafter, he drove down to the end of a road that was “kind of like a deadend with a circle at the end of it, and he stopped.” She testified that he stepped out of the car, saying that he needed to “use the bathroom,” then got back in the car and put a knife to her throat and said “Just be quiet. Don’t say anything.” Her testimony continued as follows:
“Well, he told me to kiss him, and I kept telling him ‘please don’t do this. Don’t do this,’ and he started to kiss me, and he put his hand up my shirt.
“Q. You say he put his hand up your shirt?
“A. Yes.
“Q. Specifically, ma’am, where did he put his hand?
“A. On my breast.
“Q. Did you ever invite him to do that?
“A. No, sir, I did not.
“Q. Did you say anything to him while he had his hand on your breast?
“A. Yes, sir, I was asking him not to do this.
“Q. Not to do what?
“A. What he was doing; what he intended to do. He just said, ‘Shut up and be quiet.’ ”
After testifying further that her neck was cut by the knife, she testified:
“A. Yes, sir. He got out of the car and started chasing me, and chased me down *825 and grabbed me by the hair of the head, and he still had the knife in his hand because I was fighting him, and I cut my hand trying to keep his hands off of me, and get away.

“Q. When he caught up with you, what, if anything, did he do to you?
“A. He was trying to subdue me. I was fighting him, and he took my jacket off and he ripped at my shirt, and the button popped off.

“Q. What were you doing when he was trying to choke you?
“A. I scratched his face, and I couldn’t get any leverage to get him off me, and I couldn’t breathe, so I was trying to push him off and I couldn’t, and so I stuck my thumb in his eye.
“Q. And after you did this, what, if anything, happened?
“A. I tried not to go unconscious, but I did.
“Q. What was the next thing you remember after that?
“A. Well, I looked up and I saw the stars, and I realized I wasn’t dead, so I tried to get up and run.
“Q. Where was he at this time?
“A. He had gone back to his car, and he was in his car.

“Q. And when you came to and you got up and started to run, what, if anything, happened then?
“A. Well, I couldn’t very well run, because I was too weak, and he caught me again by the hair and tried to drag me back to the car.
“Q. Did he say anything to you then?
“A. (Indicating no.)
“Q. Did you say anything to him?
“A. Yes, sir, I was crying and asking him why he was doing this to me because he and my husband and I were all friends, and I couldn’t understand why. And I kept saying that I didn’t want to die, and that I didn’t want this to happen because I would never do this, and that I just wanted — I told him that I just wanted my husband, and that I couldn’t ever do anything like this to my husband, and I didn’t want this to happen.
“Q. Did you ever, during this period of time, make any sexual advances toward Robert A. Wright?
“A. No, sir.
“Q. After he caught you this time, ma’am and dragging you back to the car, what, if anything, else happened?
“A. Well, he said that he was sorry; that he hadn’t meant to hurt me, and everything, because I was crying to him.”
The argument advanced by appellant for a reversal of the judgment is in two parts. In Part I, the argument commences with the sentence, “The Court did not adequately instruct the Jury as to the use of prior inconsistent statements for the impeachment of a witness.” Prom that beginning of his discussion of the subject, appellant proceeds in his brief, with citations of cases to support him, to say that, if a court’s oral charge “is not as full and instructive” as it should be, an aggrieved defendant’s “remedy is to request written charges elucidating and explaining the Defendant’s theory of the case.” Defendant’s requested written charges were refused by the trial court. All of such charges were unnumbered. As set forth in Lowery v. State, Ala.Cr.App., 381 So.2d 659, neither Code of Alabama 1975, § 12-16-13, nor its predecessor, contains a requirement that charges be numbered, but numbering or lettering of the written charges is conducive to a more concise and understandable discussion of them in an opinion. Notwithstanding the fact that the written charges are not numbered or otherwise designated, we consider them in connection with appellant’s challenge of the court’s action in refusing any of them and in the light of a part of the court’s oral charge on the same subject. In the court’s oral charge, we find the following:
“If you find that a witness testified to you falsely, the law says you are entitled to disregard that witness’ entire testimony, or you can separate, again, the truth *826 ful, the believable testimony from the unbelievable, basing your verdict, of course, only on the believable and the creditable [which we believe is spelled incorrectly and should be ‘credible’] testimony.”
The quoted portion of the oral charge is more favorable to defendant than defendant’s refused written charge as follows:
“I charge you, Ladies and Gentlemen of the Jury, that if you believe that any material part of the evidence of any witness was wilfully false you may disregard all of the testimony of such witness [emphasis supplied].”
The quoted requested written charge was more favorable to defendant than the other requested written charges on the subject. The oral charge was more favorable to defendant than any of his refused written charges on the subject, and there was no error prejudicial to defendant in the refusal of any of them.
By the only other issue presented by appellant, he asserts in his brief that it was error for the court to allow the alleged victim “to testify that the reason for an inconsistent statement [by her] was that she was not allowed to sign the warrant she desired to sign ...” Without attempting to decide the disagreement between the parties on appeal as to whether her previous statement was inconsistent with her testimony, we find that the defendant’s only objection to any question asked the witness on the subject came too late, for it was after the witness had definitely answered the question, as shown by the following part of the transcript:
“Q. You signed this [a written statement she had made at the time she swore out the warrant for defendant]?
“A. Yes, sir.
“Q. Okay. Could you get the warrant that you wanted?
“A. No, sir.
“MR. SHINBAUM: Object. That calls for a mental operation.
“THE COURT: Overruled.
“Q. Were you allowed to get the warrant that you wanted?
“A. No, sir.
“THE COURT: Let her testify to her mental operation, not somebody else.”
Irrespective, however, of the untimeliness of the objection, we find no error in the court’s ruling.
“If a witness admits on cross-examination that he has previously made a statement contradictory of his present testimony, he may testify on redirect examination as to why he made the inconsistent statement. . . . The extent to which the impeached witness may go into the reasons why he made the prior inconsistent statement is largely within the sound discretion of the trial court.” Gamble, McElroy’s Alabama Evidence, § 159.03(1) (1977).
We have considered all issues presented by appellant and find them without merit. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.